Good morning, Your Honors. Thank you. This case involves an alleged mail fraud scheme in the context of a telephone solicitation for magazine subscriptions. And if it would please the Court, I'd like to address my comments this morning to two areas. Number one, the prosecutorial or governmental misconduct during the investigation and the prosecution of the case. And the second area would be the jury instruction regarding the independent statutory duty violation, which may form the basis for a fraud conviction. Was that the issue that the prior Woods panel decided, the latter one? Yes. Why aren't you bound by, or why aren't we bound by our prior panel's determination adverse to you on that issue? On the jury? Yeah. Well, Your Honor, I believe it's the opinion cites the Dowling case, and there is no language in the Dowling case to support the decision. In fact, you might be able to see it. But even if they're wrong, we can't decide the case adversely if it's the same issue, can we, without going in vain? Well, I can't cite any authority, no, Your Honor, at this point, no. You've got the authority right here. Right. You would have, I would believe, to review your own decision, and if it's not supported by the case that you cite you've got to go in vain. You do that only in vain. Right. Then I will address my comments primarily to the issues regarding the prosecutorial misconduct and the investigative misconduct. The first area involves the suppression of interview tapes, and in that regard, the government claims that no tapes were ever made at the interviews. These were the statements were made in declarations opposing the motion for a new trial. And as I point out in my brief, several witnesses did in fact state that their interviews were taped. The response to this by the government was that these people were elderly and may have been confused by the presence of a tape recorder to play tapes that perhaps were used by the defendants in their mail fraud telemarketing scheme. I don't believe this is true as far as the witness is being confused by the presence of the tape recorders. If it is true, then you have to call into question the reliability of their testimony in general and a conviction based on that testimony. I mean, if they're that confused by the presence of a tape recorder, how reliable is their testimony and how reliable is their perception of events as they truly occur? One witness, Millie Davis, testified that she was not taped just one time but three times, once by an FBI agent, once by an assistant U.S. attorney. Let me go back to that last point. The conversations were tape recorded, were they not, between your client's company representatives and the elderly victims? So we know what the content of those conversations were. Right. You're talking about tape recordings of what allegedly my defendants said to customers over the phone. Right. So even if they were confused when they were interviewed in preparation for trial by the AUSAs and the case agents, we still have verbatim what occurred vis-a-vis the company and the victims because it was taped, right? Yes, but there's not a correlation between each witness and a tape of what was told to that particular witness. I don't believe that you can show that for each witness that I'm about to name, there was a tape recording of what was told to them by the representative of the telemarketing. So there were other conversations that weren't recorded? Is that? Well, I think we're talking about two different types of recordings. The recordings I'm talking about and the suppression of the recordings that I'm talking about are the interviews with the witnesses by the government. No, I understand that. You're saying that if they were confused as to whether there really were being recorded, that would tend to undermine the credibility of those elderly witnesses. Right. But my question is, that may be true with regard to their ability to perceive or remember what happened during the interview, but to the extent that you're arguing that it undercuts what was said to them in furtherance of the scheme to defraud, we have those conversations on tape. We know exactly what was said by both sides to the conversation. Well, again, Your Honor, I don't believe it's been – I haven't seen it. I haven't seen it pointed out that there have – there are verbatim transcripts or notes of what was told to the particular witnesses that testified. That's not on the tape? I haven't seen or heard of those tapes, no. I think you and I are talking past one. Let me try it again. As I understand it, the prosecution introduced in its case in chief certain recordings that were obtained, I guess, in a search of your client's business premises, which consisted of conversations between representatives of the company and these elderly people, which were recorded, for whatever reason, by your client. And those tapes were played at the trial. The jury heard those conversations. Right. And the contents of those recordings were the basis for the government's proof that these victims were defrauded in some fashion by your client and his co-defendants. Am I right so far? Yes, that's part of the basis. Okay. So now you're complaining that there were other conversations between the government and these same witnesses in preparation for trial that they thought were recorded, but apparently the government says they were not. And therefore, I'm still trying to figure out how it is that there would be an inconsistency if we know exactly what they said because of the recordings of the conversations that are most important to us, i.e. what representations were made in furtherance of the scheme to defraud. All right. There's two points that I would like to make in response. Number one, I don't think we've made a correlation or an exact meeting between the telemarketing offices and each witness as they testified. What I'm talking about are the tapes of the interviews of the witnesses by the government where there may have been inconsistent statements. There may have been, and we believe there was, an extreme amount of coaching, indoctrination into the witnesses. And this touches upon another issue that goes beyond the tapes, which is the first contact with the witnesses. We maintain that the witnesses were not first contacted by a neutral questionnaire for them to fill out, as the government maintains, but they were contacted by phone. They were informed they were victims. There was somewhat inflammatory or prejudicial language used to put these people in a victim state of mind. And if you're talking about elderly people who are being contacted by governmental officials, there's a great deal of trust that's going to be put into their words so that these witnesses were pretty much indoctrinated and coached all along. So what's your point? Our point is that these questionnaires and tapes were not furnished to us so that we could see the whole story all along as it developed and see where they may have been improperly or unduly influenced or even supplied with information. There's, as we pointed that out in our brief, there was a couple of people that said they were fed information. Yeah. You want to save the rest of your time? Yes, I would, Your Honor. Thank you. May it please the Court, Ilana Artson on behalf of the United States. As I think we've agreed at this point, the only issue that is still remaining following the published disposition of the Codefendants' Appeal is whether the district court erred in denying the new trial motion. After the verdict, a defense investigator went out and interviewed four of the victim witnesses who had testified at trial, and that is the basis of the new trial motion. Three of those witnesses indicated during those post-trial interviews that at some pre-trial interview with the government, they had been tape-recorded. They also claimed that they had given some documents to the government which the defense alleged were not produced in discovery. The fourth victim who was interviewed said that she had been interviewed in a pre-trial interview, and the defense claimed they didn't receive discovery. There were also two witnesses who didn't testify who were involved in this motion, one who supposedly gave some notes to the government, and the other, Eric Bennett, who was the husband of a codefendant who pled prior to trial. He claimed that he had been interviewed during trial and had made a statement, and the defense claimed that that was not provided. The district court in this case did not resolve the issue of whether these statements actually existed. The government indicated that they didn't. For purposes of the motion, the district court assumed that even if they did exist, there was still no basis for a new trial. That ruling was not an abuse of discretion. So you're telling us that these conversations with witnesses conducted by government investigators never took place? There were pre-trial interviews with the witnesses. However, the government's position was that they were not ever tape-recorded, and therefore there was no Jenks material. However, there were reports of interview and notes that were turned over to the defense in discovery. The real basis of the motion in the district court was that it was turned over to the government. So they got everything, everything the government had, it was turned over to them. That was the position put forward in the three declarations submitted in this case. Well, just tell me, is that what happened? Your Honor, I was not the assistant who tried this case. So as far as I know, I can only rely on what I've learned. This is not a congressional investigation. As far as I know, these items do not exist, but that determination is not for me to make. That determination is for the district court to make if the claim is properly raised and if that would be material to a determination of this motion. In this case, however... But if the district court has told the truth. Correct. But in this case, Your Honor, the district court didn't need to make that determination because there was no basis for this new trial motion, even if these documents and statements did exist. There were three bases asserted for the motion. The Jenks Act, Rule 33, and Brady. None of those required a new trial in these circumstances. And I just wanted to review each of those claims briefly. And first of all, let me try to respond to the question that was raised earlier. Well, isn't that kind of a cop-out? It is not, Your Honor, because this is not a proper vehicle, first of all, for trying to impeach the government's witnesses, going out after trial and then seeing if you can create some impeachment evidence. It has been the rule since Ogden v. United States, which is a case that's cited by the defense at page 22 of their opening brief, that a Jenks Act claim cannot be asserted on appeal if there is not a specific request for those documents after the witness has testified at trial. And it's undisputed that we did not have any such request in this case. And therefore, under the very cases that are cited by the defense, Ogden, which is, although a very old case, has been repeatedly cited in Stilger law, there is no valid Jenks Act claim that can be raised by this defendant because these materials, the documents that the witnesses supposedly gave the government and the taped pretrial interviews, were not specifically requested at trial. And Ogden points out in describing what happened in that case to two different witnesses. As to one witness, the defense during cross-examination elicited that there had been a number of pretrial interviews and that during one, some notes were taken, but made no specific requests after eliciting that information for the statement. So what you're saying, you're saying that counsel was ineffective? If counsel was ineffective, that can be raised in 2255 motion. I don't think counsel was ineffective because ultimately, these statements were not material in a Brady sense and would not have produced a new trial. Because even if you excluded them. But you tell us those statements didn't exist. Well, you don't think they existed. Your Honor, I don't think they exist. What I'm trying to define for Your Honor is if this issue had been raised in a timely fashion at trial, then the Jenks Act would not allow the court simply to take the government's word for the fact that it didn't exist without inquiring further. Counsel, what you're really telling Judge Pragerson is you're relying on the record as prepared, certified, and on file in this case in the district court. Correct. You're not willing to make any representation as to what went on at trial beyond what is in the record because you weren't there. Is that right? That's correct, Your Honor. And I'm also stating that based on the record that was developed in the district court, the district court did not abuse its discretion finding that even if these materials existed, they did not warrant a new trial under Jenks, Brady, or Rule 33, because even if you excised the testimony of those three witnesses, the result of this trial would not have changed. There were a total of ten victims who testified, of whom only three were the subject of this new trial motion. The other seven victims all testified consistently that they had been solicited in a prize promotion, they were told they had won a large prize and they needed to send money, and they were not told until after they sent the money that, in fact, the money was to buy magazines and the prize was just free for participating in the promotion. They were led to believe they had won a large prize when, in fact, they got a gift. Now, to answer Your Honor's earlier question, those earlier sales calls were not recorded. Only the final sales call, which is called the verification call, is recorded. And during that call, the odds of winning, the 1 in 4,000 odds of winning were disclosed, and for the first time the victims are told the money is to buy magazines. There were, each of the victim witnesses who testified, their verification tapes were played at trial. There were also other tapes played at trial during which victims said, magazines? You never said anything about magazines. In addition, there was accomplice testimony. There was also forensic summary testimony describing every single client file that had been seized during the search of both of these businesses, which showed that half of the victims, almost half of the victims, did not receive any magazines, did not receive any prize, even though they were told in the verification call that they were absolutely guaranteed such a prize. So even if you completely excise the testimony of these four, and I would say it's actually only three, but even if it was four, you still had the other six victims, you had the verification tapes, you had the forensic tapes, you had the accomplice tapes, the accomplice witness, and you had this defendant who testified at trial and admitted to most of the elements of the government's case. During the course of his testimony, he admitted that in the opening calls, the victims were not told they were buying magazines. All they were told is, this is Fred Stone and we're from MTI, the company that sells magazines and runs the no-obligation giveaway. He admitted that the one prize that was awarded was never sent to the victim, Nita Furman, because she didn't return a prize certificate, even though she was told she was absolutely guaranteed a prize. And he testified that he made the decision, although it was not disclosed in the verification call or in the prize certificate that you had to return these documents in order to claim the prize. So virtually all of the elements of the government's case and of this fraud were even brought out and admitted by the defendant as well as the other co-defendant, Dorian Woods, who testified. So even without having determined whether this material existed, even if the material did exist, there was no basis under Brady to find that it was material, to find under Rule 33 that it would have warranted a new trial, or to find that it was a jank statement. I would also point out under Rule 33, in order to prevail on a new trial motion, the evidence has to be newly discovered, which means that the failure to learn of it sooner can't be due to a lack of diligence on the part of the defendant. In this case, there is no reason why these interviews could not have taken place prior to trial. The defense decided to go out after trial and interview the witnesses in order to try to see if they could come up with some impeachment material, but that is not due diligence, and we've cited a number of cases in our brief indicating that that type of evidence cannot support a new trial under Rule 33. Finally, we also pointed out that this is a jank's claim itself is not newly discovered evidence. The evidence itself may possibly, if it met all of the requirements and had been timely discovered, could possibly support a new trial motion, but a jank's claim itself is not, quote, newly discovered evidence. For all of those reasons, the district court did not err, and its decision denying the motion for a new trial should be affirmed. Thank you. Thank you. Well, did you request this jank's act material? It says, after a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement of the witness, et cetera, et cetera. Well, did you do that? I believe that was done, Your Honor. Well, I mean, did you do that or did you not? I was not the trial counsel. Well, I mean, what does the record show? The trial counsel asked for those statements or not? I believe they did. I can't point to that. Well, I mean, that's pretty critical, isn't it? Yes, Your Honor. I mean, it's as important as knowing that you can't come to a three-judge panel and reverse another three-judge panel. I understand, Your Honor. I believe that was done, and I also believe that there's an independent duty in some cases for the prosecution to turn over evidence. Not under the Jank's Act. Well, no, under some of the other theories. Now you're switching to Brady, but the question we're asking you is the Jank's Act. You've got to make a request. Right. And you can't point to anywhere in the record where the request was made. For the Jank's. Right. Yes, Your Honor, that's correct. Well, you just told me a minute ago that you didn't know whether the request was made or not. Now you say you can't point to anywhere in the record where a request was made. That's right, Your Honor. So those two statements, I guess, are consistent. Yes, Your Honor. Okay. I'd like to get back to the tapes that were suppressed. We believe that there were, in fact, tapes that were made that were suppressed. There are just too many witnesses that said their interviews were tape recorded. And then the government denies that the interviews were ever recorded. And they did so, I believe, in declarations under penalty of perjury. Well, let me ask you a question about that. Don't you have to do something more? I mean, your investigator interviewed the witnesses. Why couldn't the investigator say in the course of the interview, you know, what did you talk about to the government agents, and at least provide a declaration with an example or two of something that they allegedly told the government agents that was inconsistent with their testimony? Instead, what I hear you saying is, you know, well, we don't know. They might contain inconsistencies. And they might exist. And, therefore, we're entitled to see whether or not, A, they do exist, and, B, whether or not there's anything material that's inconsistent in there. Is that what the law requires? Or if there was improper coaching or tainting. Yes, I believe that if it – because what your question is, why didn't the investigator ask the prosecutors what was told? Oh, the witnesses. Yeah. What did you tell the prosecutors and the agents? Well, then that would assume that the witnesses' memory would be total and accurate, that everything that was said would be recalled to the investigator. So is your answer that all four witnesses said, I don't remember what I said to the – or did they say I told them the same story that I testified about at the trial? I don't know exactly what was told. But the question I'm asking is, don't you have to show some reasonable likelihood that there is exculpatory, material, inconsistent statements that might be contained in those recordings before you can invoke the protection of the Brady Rule? Right. You're right on that. And I believe that we have shown that given the testimony of the witnesses, together with the – and I'm talking about the testimony of the witnesses regarding the coaching and the preparation of the witnesses, that the tapes would yield – Well, you characterize it as – I mean, there's nothing improper in a lawyer meeting with a witness before they testify to go over their testimony. No. I mean, it's how that's conducted that determines whether you step over the line into improper coaching. Right. And we would have liked to have seen or heard what took place in those interviews. I think I understand your point. We have your argument. Thank you, Your Honor. I apologize. I was so focused on my argument, I forgot to announce my parents. Eric Smith for defendant appellant. What did you say? What did you say? Your Honor, I'm pointing out that I forgot to announce my parents at the beginning of my argument. Oh, okay. I apologize for that. Well, I thought you – We show on the calendar, so we have your – Yeah. Thanks, Mr. Smith. I thought you said you forgot to announce your parents. I was going to have them stand and be recognized. Be recognized. But, you know, I'm old and I don't hear too good. We'll take the next matter.
judges: Pregerson, Beezer, Tallman